Circuit Court of Appeals. We are very happy to have you here with us today and we're also very happy to welcome Judge Jackie Becerra from the Southern District of Florida who is being kind enough to assist us this week on Wednesday and Friday with our appeals. I think you're all familiar with our lighting system but just a quick review. The yellow light means you've got two minutes left. The red light means your time is up. We ask that you please finish promptly when the red light goes off. The only exception to this is if we have a question for you, we do want to hear your answer even if it takes you over your time. All right and with that, we've got four appeals today. We'll start first with the United States of America v. Jorge Perez and we'll hear first from Mr. Marni. Good morning. May it please the court. My name is Ron Marni. I represent Ricardo Perez. My co-counsel Don Samuel is here. He represents Jorge Perez. We're going to split our time up by issue, not by defendant. I'm going to talk about the sufficiency issue and Mr. Samuel is going to handle the juror misconduct and we can both answer questions about the rest of it. So I'll get started with a great quote from Judge Corrigan that happened after both trials. There were two trials here. It's sentencing but here's what he said. I also want it to be said that this case was more nuanced and less black and white than the government's sentencing argument admits. And there's a lot of reasons for this in my view but I think it's demonstrated by the fact that the first jury in the case was hung on some counts against the Perez's and all counts against the other defendants and the jury in the second trial hearing essentially the same evidence found all the defendants not guilty. If I were to take an educated guess, that result might at least be in part attributable to the conundrum of whether the defendants exploited a legal loophole or committed a crime. This is the trial judge after sitting through more than two months of trial on these same issues. He's questioning whether a crime was committed or a legal loophole. It's not black and white. This is a criminal case. We're talking about putting people in prison for almost ten years. I would submit that the evidence should be black and white. We shouldn't put people in prison with gray evidence. On the sufficiency issue, where's the crime? The government has not ever really been able to answer that. We've had two requests for bills of particular, a 57 page government brief and I don't think you're going to hear it today. There is no statute, regulation, guideline, traffic ordinance or anything that can be articulated that these defendants broke. Because of that, there's no fair notice to them that their conduct could be a crime. That is the concept of nullum cremens sine legae. There is no crime without law. Can I ask you a question? In your blue brief, when you're talking about the sufficiency of the evidence, you say that the vast majority of tests were screening tests and those tests were performed in the hospital laboratories and the specimens were sent to the private laboratories where confirmatory tests were done. Other than Kelly Tobin's testimony, you don't cite to any other evidence supporting this. Can you point to any evidence other than Kelly Tobin's testimony? Yes, your honor. There wasn't a lot of testimony about that, but each one of these laboratories have what's called a lab information system, capital LIS, which tracks where the tests were run. The government seized the LIS system at CGH and had it right up until just before trial, but those computer systems show that the vast majority of the tests, upwards of 90%, were screening tests performed at the hospital. There's also record evidence that even when it said screening, sometimes it was referring to the more in-depth test, isn't there? That's been suggested by the government, but that's not correct. Wasn't there evidence to that effect that was put on during the trial? There was some testimony mixing up the terms. That's true. That's your interpretation of it, but why could a reasonable jury that decided to believe that testimony not have concluded that that was fraudulent? Well, there's no crime against billing for screening tests or for confirmation tests. Well, there is though if you're billing for the more detailed test that's more expensive when all you're doing is a screening test. I don't think there was testimony that there were screening tests that were billed as confirmation tests. I don't think that's in the record. I could be corrected. All right. Can I ask you a question about the 141 codes? Yes. It seems clear from the evidence and your argument that your client was putting the 141 code and it was the clearinghouse that was changing it to the 22. But even as to the 141 code, isn't the 141 code as well as the use of the NPI and the tax ID, doesn't that all suggest or outright say that those tests were being performed at the hospital? It doesn't mean that. The CMS definition, that's the only one that's out there for 141 is a sample that is submitted. Let's put the CMS definition aside for a minute. I thought the evidence at trial, and tell me if there's anything different, the expert testimony at the trial was that, let's go just to the NPI and the tax ID code, that is indicative, right? That the test was performed at the facility for which the NPI and the tax ID code are provided. There was testimony to that effect by some of the government witnesses. It's not really correct. The 141 code just means that it's a non-patient, that the sample is at the hospital or the sample's been submitted for analysis. It doesn't speak at all to who actually performed the test. But the NPI and the tax ID do. NPI and tax ID number, they don't suggest who did the test. The NPI and tax ID number are in the blanks on the CMS UBO form for billing provider, not performing provider. It doesn't tell you who did the test. All it tells you is who is sending the bill and who wants to be paid. There is no blank on those forms, which are required by the insurance companies. There's no place to put on the claim forms where the test was done. Wasn't there also evidence that urine was being sent from around the country to this facility, knowing that there's a certain amount of time it can be out of the refrigerator, I guess, before the tests aren't going to be effective, and that ineffective tests were performed on this urine that had been out of the refrigerator for too long, and also that tests were being performed unnecessarily, like some inordinate number of tests for screening of individuals who were at drug facilities testing like every day? Wasn't that also put into evidence? There was some evidence of some of those things. There was evidence that there were samples that sometimes were left out too long, and they do become, they perish. They do become unusable. There was no testimony and no evidence whatsoever that there were tests run on old urine or that one single bill was sent for any test like that. But there was testimony that sometimes there were so many samples that they were just processed for billing and no testing actually occurred, or at least testimony to that effect. There was testimony by a government witness to that effect, but there was no testimony that the tests were run or that there were bills sent for tests on old urine like that. On the, going to sort of the red flag issue that both judges to my left are talking about there, the hospitals were also billing for the huge number of tests for a single patient. For example, a hospital billed for 156 definitive tests and six presumptive tests for a single patient on a single day. Why is that not a red flag sufficient to put your clients on notice of health care fraud? Well that, if correct, it probably would be, but we disagree with that testimony. It was given by Mr. Waller, who kind of feeds into our newly discovered evidence argument. Mr. Waller was brought on late, there was an expert named Clark who dropped out maybe a month before trial. Waller did some different things. What he did was he took the spreadsheet information, fed it into a database, told the database these CPT codes are screens and these are confirms. And if you tell the computer that all the codes that were billed are confirms, it's going to count a lot of confirms and that's what happened. The problem is the government didn't disclose his testimony. The government didn't tell us what Mr. Waller was going to say and this database that he used, they didn't produce it until six months after trial, so we couldn't test it and cross examine him effectively on that. All right, thank you. Mr. Samuel. Good morning. May it please the court, I'm Don Samuel from the Atlanta Bar. Great to be here. I'm going to address the jury misconduct issue and the failure of the trial court to conduct investigation into the issues that were developed, but little information was developed during the questioning of jurors. This is an unusual circumstance in which this issue arose. This is not a case in which juror misconduct was learned during the course of trial. It is not a case in which post-trial, the initial conversation with any jurors was initiated by the defense. In this case, it was the government that had the initial conversations, initial conversation with a juror that lasted for 28 minutes, clear violation, unmistakable violation of the local rule. For 28 minutes, the prosecutor talked to a juror. I don't think there's any question that the prosecution shouldn't have done what it did. Absolutely. But that's not the issue, right? That's not the issue that we're here on. It's the issue which is the premise of everything that happened in this case. The prosecutor not only had this, he didn't initiate, the juror called him, but the AUSA and then a DOJ lawyer also joined in on the call for 28 minutes, talked about deliberations. To go back to what Judge Rosenbaum is talking about is we are here to talk about what happened after that. That's right. We've read the facts. We know what happened with the prosecution. What I'm struggling with is you need to tell me how the district court abused its discretion in finding that you violated its order not to ask the juries about their internal discussions because the district court did in fact allow you to have contact with the juror . . . That's right. . . . but constrained you and then found that you violated that constraint. The constraint was vague. What the constraint said is a couple of different places. First, there's an oral order from the court saying I don't want you to use this as a means of acquiring information that could be used . . . But the written order says defense counsel may not speak with any juror about the jury's deliberation process or internal discussions and should caution any juror not to talk about the deliberation process or any internal discussion. They were cautioned. One of the lawyers on the call, Vince Citro, began every . . . he was not one of the two for the defendants here, but he was part of a group that . . . But it's not enough to do a disclaimer and then affirmatively ask for their internal discussions, which is what happened. No. They asked for external discussions. They asked . . . they were not . . . the clear context of what the judge said, Judge Corrigan said in the oral was do not talk about deliberations or internal discussions. What does internal discussions mean in a sentence that begins with deliberations or internal discussions? What they were . . . You could have asked the district court for clarification. Maybe we could have, but we didn't. The lawyers didn't. Well, the reason that the district court wrote it the way that it did was because counsel, defense counsel specifically said, we don't want to use this at all to seek a new trial. We're not interested in doing that. That's what they said. I mean, did they not? There were lawyers who had a mistrial who initiated the whole process. They wanted to learn what to do with their new trial. Our clients were convicted. They were not the ones who initially filed the motion to get permission to interrogate too strongly. That's true, but you can't sort of put that to the side because as you know, the context in which the judge issued the order was precisely that he was told that it would not be used to seek a new trial. That is why the judge specifically said, you can't ask about their deliberations. They didn't ask about deliberations. The issue before us has nothing to do with deliberations. The government asked about deliberations and they're questioning. The lawyers in our case, Landis and Bell, the two trial lawyers who participated in the call, never asked about, at least with regard to what we're dealing with today, deliberations. They were . . . How do you say that when what they specifically asked about was the issue of whether or not they had any of this outside information? They did, but not at deliberations. How could that not be something that the jurors were discussing? How could that not be discussions amongst the jurors? It was a juror talking to his wife. The wife had Googled information and told the juror, and now we're finding out from the jurors about external conduct, about external information that was in the juror. It was not in deliberations. How do you even get to that question, right, unless you're asking about the deliberations of the jury? They would never . . . They did not talk about deliberations. They said, was there any information you learned about outside the scope of the courtroom? And they said, yes. One of the other jurors asked his wife, and the wife Googled George Perez and found out information about him. No investigation conducted at all by the trial court after finding out that that had occurred. Wait a minute. You're jumping a couple of steps. That's because the trial court found that the lawyers had violated the order. He said he violated the spirit of the order. There's a difference. I'm not going to quibble with you on whether it's the spirit or the actual letter of both the written order as well as, for sure, the spirit, if not the exact letter of the oral order. Right. Taking that all aside, the court then makes the decision that the order has been violated. Why was that an abuse of that court's discretion to do so? Then once the court did that . . . By the way, it really seemed to me like the lawyers admitted that they had violated the court's order and almost apologized to the court for doing so. They were candid. Right. They violate the order. Once they violate the order, then the remedy for that is striking the affidavit. Once you strike the affidavit, what evidence, if any, does the defense have to show that there's a colorable argument that would have required any further action by the district? If I may answer, I think we disagree that they violated the clear order of the court. The clear order of the court was, don't touch deliberations. Internal discussions, to me, is a very vague phrase. I can't even understand what it would exactly prohibit. What they asked about was external communications. External, not internal. External communications that would pollute the jury. That's exactly what's prohibited and exactly what should have prompted the court to at least investigate. Counsel's motion say, quote, the purpose of this motion and the communications, if permitted, is not to challenge the validity of the verdicts against Jorge Perez and Ricardo Perez. That is their motion and that was part of the motion filed by the co-defendants as well. Of course, they didn't have a verdict in those cases. You don't know how they- How would they challenge those verdicts if they weren't their counsel? I'm sorry. I've lost track of that question. There were many lawyers- The purpose of this motion and the communications, if permitted, is not to challenge the validity of the verdicts against Jorge Perez and Ricardo Perez. Even the government in their brief says, sometimes when you're doing juror interviews, you don't know what's going to come out. That may not have been their purpose, but they still had the right to interview jurors. They were given authority by the court to interview the jurors with a vague limitation on what you can talk about. Opposition is they didn't violate it. They didn't violate the order of the court and therefore, at a minimum, an investigation to jury misconduct should have been conducted. Let me give you another opportunity there and correct myself because you have to find that the court committed a clear error in noting that and finding that the lawyers violated his court order. Clear error tends to be a factual question. I usually use a clear erroneous standard when you're talking about facts. You have the authority and the power to look at the court's order, which is vague when it talks about internal discussions, whatever that means. It's vague when he later says, you didn't necessarily violate the actual language of the order, but the spirit of the order. You have the authority, just as the judge can, in deciding whether what they did was a violation. I don't think the clear erroneous standards, it's not a factual question, it's a legal interpretation of what they did. Well, to be clear, he said the questions violated both the letter and the spirit of the court's order. That is what he said. Yes, but the letter is don't talk ... I'm sorry I'm over my time here, but I think the clear substance of the order was don't go to deliberations because that is such a red line to cross when you start asking jurors about deliberations. When you find out that there were extraneous information considered by the jury during a trial, it's automatically, automatically during a trial, you have to investigate. Yet here when you find out after trial, after being given authority to talk to the jurors, we're told we're not even going to investigate the misconduct that leads people to end up in prison. All right. You've reserved three minutes for rebuttal. We'll hear from Ms. Rao. May it please the court, Sangeeta Rao on behalf of the United States. I'll start with fraud and then go to the juror issue. The evidence here sufficiently proved the fraud and the fraud conspiracy. There are two independent fraud theories that support the convictions. One is that the defendants misrepresented that the hospital performed the test, especially the expensive definitive test. The second one is that the defendants misrepresented that the urine tests were medically necessary. Sufficient evidence on either theory requires rejection of the sufficiency challenge. What's important for this court's analysis is the district court denied the motion for judgment of acquittal. Notwithstanding any comments it made at sentencing, when it looked at all of the evidence, it found that the evidence was sufficient. There are five overarching facts supporting both the fraud theories and the district court's denial of acquittal motion. First, there was this massive overordering of medically unnecessary urine tests, what George Perez termed liquid gold, particularly those expensive definitive tests, almost $1 billion billed in just about two years. Let me ask you a medical necessity question. I recognize the government's evidence showed that the pattern of testing was contrary to the standard of care, what you're talking about now. We have two defendants who are not physicians. They're not medically trained. Why should we embrace the theory that the criminal defendants who are not doctors, not medically trained, would be aware of a standard of care? We know that doctor's orders can't just insulate non-doctors from fraudulent intent, findings of fraudulent intent. This court said that in Gros, a palin that we cited where non-doctors are held. Here, circumstantial evidence can prove intent, red flags can prove intent, and there were abundant red flags here. There were kickbacks paid to the recruiters to encourage the collection of more specimens. In Gonzalez, that's a clear indicator of fraudulent intent. The expert testified that the huge volume and frequency of the testing made no medical sense at all. It was excessive at scale. We're not talking about just a little bit of excessive testing. There was massive excessive testing. The defendants billed for 3.7 million definitive tests compared to about 81,000 presumptive tests. That's in government exhibit 25K. Again, 933 million was billed for definitive testing, 41 million for presumptive. Those ratios are so skewed that it's a red flag. The defendants were not low level. They owned and powered the billing company or were the CFO for Empower. They ran the hospitals. Jorge Perez was in charge of the three hospitals, CGH, RGH, and Putnam. Not necessarily owned them, but in control. We cited... Does the sequence of events of when each hospital was used tell us anything about the scheme? Yes. That's also part of what this court can rely on for finding intent. They used it as dominoes. When one hospital fell because investigators caught on, they moved to the next hospital. We have evidence that Florida Blue caught on about what was going at CGH. They issued an alert. Defendants knew about the alert. The alert said, you can't bill like this. They moved it to RGH. They moved to Putnam. At Putnam, the fraud is particularly egregious because there was no capability of testing for months until February 10th, 2017. They couldn't test definitive, presumptive, nothing. Yet defendants back billed at Putnam. We have evidence of tests from 2016 when Putnam couldn't do anything. The very nature of the scheme that they instituted shows the fraudulent intent. They had all these tests that were submitted not to the hospitals, not to these tiny rural hospitals that insurers wanted to protect and make sure that people got covered and that they had enough money to survive. The specimens were sent from all over the country to these independent labs. The independent labs then had to mail them to these tiny hospitals. They look like schoolhouses if you see pictures of them. That absolutely couldn't handle the volume. When they came, sometimes they were just accession. They were just put in the data and then sent right back out. Other times- You would agree as to this first theory of fraud that the Perez's were lying to the insurance companies by misrepresenting tests that were performed by independent labs. The information on the claims forms was false only if the contracts prohibited pass-through billing, correct? This becomes fraud only if the contracts, because we're dealing with a private insurance model here, not government insurance. The contracts are definitely part of the context. Of course, just a contract violation wouldn't prove fraud. But if the contracts permit this pass-through billing, then this would not be fraud? Yes. The contracts, well, to the extent that the tests are actually required, right? I was just going to say, there's so much in the assumption. If the contracts- That's a medical necessity issue. Because we know, I want to go back to the code 141 that we have talked about. How could the Perez's be committing fraud if they're labeling all these services with a 141 code? Okay. So that, again, two different fraud theories. They could label as 141 and it can still be medically unnecessary. But I want to talk about- Okay. But on the first, on that, that's fraudulent. That theory is fraudulent because hospital's credentials were used to do the billing. We had industry experts and insiders testify that the fundamental code of billing is that you bill for what you perform for. So that's the general rule. And we've got experts and insiders that said that. We cited a lot of it in the brief. I can go through those right now. Yes, there was a 141 code for the type of the bill. That signifies a non-patient has a specimen that's submitted for analysis to a hospital. The industry experts also testified that the 141 code was not appropriate in this situation because the specimen has to be submitted to the hospital. It wasn't submitted to the hospital. It was submitted to the independent lab. So just to be clear then, even if pass-through billing had been allowed, 141 would have been improper. That's what the industry experts said, yes, as a general rule. Now what defendants do is they, and there's the contracts that didn't allow this, that didn't allow billing by affiliates. It's a constellation of facts, but I think that Judge Branch, your question is going to that Medicare exception that they are relying on, section 40.1. That's a small Medicare exception to the general rule that you bill for what you perform. And the fact that there's a small exception that applies to Medicare doesn't exonerate the defendants. The facts don't qualify as a reference lab arrangement. The industry expert, Consfed, said that. The specimen wasn't submitted to the hospital and then referred out for, you know, anything that the hospital couldn't do. And people sent specimens to the outside labs and then those labs sent out the specimens. This is docket 746 from 84 to about 87 where Consfed is explaining how that Medicare rule, that exception, would not exonerate the defendants. The private insurers, we're dealing with private insurers here too. So I said that the facts don't show a reference lab arrangement, but on the law it doesn't apply. It's a Medicare rule. And the expert also testified that private insurers don't adopt all Medicare rules. That's at docket 746 from 75 to 76. Industry insiders agreed, both Roche and Tobin testified about that. The sites are in our brief. I could give them to the court again. And the RGH Aetna contract confirms it. The RGH Aetna contract specifically said that reference labs were not okay. You couldn't bill. And they did it anyway. So that shows the falsity of the statements. It also shows their bad intent. Let me ask you, just on that issue, this is the Aetna contract with one hospital has a provision in the contract that says reference laboratory services are not eligible for payment. But then it goes on to say these services are generally indicated with a bill type of 141 hospital laboratory services provided to nonpatients. Does that fit with what you're saying or contradict what you're saying? It seems to contradict what you're saying because we're talking about reference labs and 141. But you're saying that's not how 141 would be used. Well, I agree that some of these contracts are not worded in the most clear manner. But I think they're saying that, yes, there is this exception for 141 codes. That sometimes happens. That can't happen here. I think that they're making clear that that Medicare rule doesn't apply here. Now, just because one contract makes clear that that Medicare rule doesn't apply here, that doesn't take away the evidence that the general principle, fundamental, the industry expert said it's not nuanced, it's fundamental that you bill for what you perform. And we are talking about a fraud scheme here. You don't have to prove false statements. You have to prove misleading statements. Half truths and omissions in that context also prove the fraud. The jury was instructed on that, on half truths. The defendants didn't object. So you look at the constellation of facts. Using the billing credentials, using the 141 code, in no way on those forms indicating that the labs did the test. There was also evidence, this government Exhibit 70, that there are ways to indicate that the billing was, that the service was performed by a lab on the hospital's submissions. They didn't do it. If you put that all together with all the evidence of their bad intent, this was a clear map. What about the evidence of how much money they made from this? Exactly. The disproportionate profits combined with the kickbacks or other indicators of both fraud and their bad intent. This entire scheme, Cori Perez said it was for liquid gold. They mined it for liquid gold for years until they were shut down. Turning to the juror issue, unless the court has more questions about, I just did want to explain about the CPT codes. There is no evidence in the first trial that there were just a massive amount of presumptive tests done at the hospital. But it doesn't really matter, because what matters is what was billed. If presumptive codes were- I have a question about that. So when Blue Cross Blue Shield shut it down, did they give any reason for why they were shutting it down? Did they say why they were shutting it down? They said it was improper to bill the way that they were billing it. I don't remember the actual alert, but this whole process of getting tests, getting specimens from somewhere else and then billing it out as if the hospital did it, because the idea is that the insurers want money to go to these rural hospitals to keep them afloat. So did that provide any notice for the next hospital? Yeah. Right. So that was one of the key facts, is that it was like a domino. The minute the defendants learned, or the investigators learned about one hospital, like CJH, and the alert was issued, defendants just moved to RGH, then they moved to Putnam. They just kept on moving, and they provided incomplete information to the investigators when the investigators asked for, let's say, lab results to back up the claims. The investigators were reluctant to put the hospitals on prepayment review because that would hurt the hospitals so much. The defendants just took advantage of all of that and ran this fraud. But the CPT codes, if I could just explain, the CPT codes are what are used. It's a five-digit code that's used for billing. So even if there were a lot of presumptive tests, the experts testified, both at the used for billing and reimbursement. So even if there were a bunch of presumptive tests, they billed for definitive tests. That's the fraud. And it was clearly proved at trial. Turning to the juror issue, the district court did not clearly err in finding the defense counsel violated its order, placing limits on the juror interviews, and it didn't abuse its discretion in excluding the juror statements as a sanction. Cavallo tells you it's a factual finding. We cited that in our brief. Whether the district court's order was violated is reviewed for clear error. A district court also can interpret its own order. And the district court did here, and it found that it was violated. It is true, though, that the whole reason that we're in this quandary right now is because the government went ahead and talked to a juror when it wasn't supposed to against the local rules. Isn't that right? You know, not completely, Your Honor. Yes, the government made a mistake and talked to the juror. The district court was already considering at that time whether to grant the co-defendant Fletcher's motion to communicate with the jurors. That was filed two days after trial. The prosecutors made the mistake on day three, immediately told the court what had happened, told defense counsel, and then a few days after that, there was a hearing. The district court, as a sanction against the government, had the government memorialize what was said to the prosecutors and share it with both the court and defense counsel, and then granted the motion for defendants to have limited interviews with the jurors. And then the sanction part was that the government wasn't allowed to have additional talks with the jurors. So it might have happened anyway that the district court allowed the juror interviews. And the sanction was that the government wasn't going to get to participate in it. But either way, the district court, in its discretion, could put limits on the juror interviews, and it did. It said that they may not communicate with the juror about his or her, well, sorry, that they could communicate about his or her individual impressions, but they may not speak with any juror about the juror's deliberation process for internal discussions. It was not clear error to find that that question about whether a juror had performed outside research was not a question about individual impressions, but instead was designed to elicit evidence of juror misconduct. But even more so, the next question, whether the juror heard about any other jurors performing outside research, was absolutely designed to get at internal discussions by the jury. And that's what triggered the statements. The district court, in its discretion, could then decide what to do after it found this violation, and this sanction was appropriate. All right. Thank you very much. Mr. Samuel, you have reserved three minutes. Is it okay if I do it, Your Honor? Of course. I knew you were going to throw me right back in the fire. However you guys want to split the time. But we didn't write it down. No, it's all right. It's all good. Just a few points. Importantly, the government has to prove false statements to prove fraud. The proof was completely insufficient. They didn't prove any statements. The statements here that they did put in are these spreadsheets. And the spreadsheets are highly suspect. So here's what happens with the statements. What about, you know, billing six times, billing for six urine tests on a single person in a single day, repeatedly? That is unfortunate testimony, but it was also incorrect. We didn't get a chance to cross-examine that expert about that. We didn't know he was going to say it, and we didn't have the basis for his opinions, and we didn't have his spreadsheet, which did prove that that was absolutely false. It didn't happen, and it never works. These insurance companies have massive adjudication systems. If you bill two times for one test or two urine tests in one day, it's immediately kicked back. These are professional billers, and they didn't do that. But back to the false statements. The only statements made by the defendants, and they're really made by the outside billing company, are the claim forms. The claim forms are, they were required to put them on a CMS form. They were submitted by a third-party billing company that was not a defendant. These claim forms were not admitted into evidence. The government didn't have them. The insurance companies didn't keep them. Well, that's not entirely accurate. I mean, they kept the information. It was just, you know, kept in a large, raw database, and then they called up fields of what they needed. Isn't that how it worked? That is true, but when they called up the fields and they put them on, they had multiple fields that were never submitted by anybody that there's no place to even put on the form. These spreadsheets suggested that the hospital put on a claim form that everything was billed as an outpatient, a Code 22. That's a place of service code that does not appear. It does not exist on the claim forms. The insurance companies added that, and the government knew it. It was admitted, but they still put it into evidence and sent it back with these jurors thinking that every one of these claims was billed as an outpatient when we admitted and we suggested that almost none of the patients were actually at the hospital. But that's not the issue. Whether the patient is in the hospital or outpatient isn't the issue. The issue is whether or not the test was performed in the hospital. That's true, and the vast majority of these tests were performed in the hospital. A small percentage of the confirms were not. To the 40.1 point, it was suggested that this is just a small exception for Medicare. I beg to differ. Medicare is the biggest insurer in the world. They process more claims than all these insurance companies combined. This Medicare exception for rural hospitals was designed by Congress back in the 80s so these rural hospitals could generate income by doing tests from outside the hospital. It's really hard to keep a 10- or 20-bed hospital open because you may only have a few patients at a time. That was something that Congress wanted for these hospitals to be able to do tests from outside. And no hospital can do every test. All hospitals have to refer tests out. There are a couple of tests, but the only hospital in the country that can do them is Baylor. Every single hospital in the country that has some of these fancy Baraka gene tests ordered, send it to Baylor. Baylor doesn't have a billing department. The hospitals bill for them. It happens every day. All right. Thank you very much, Mr. Marni. We'll take your case under advisement. The next case is Todd versus Secretary of Health.